**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| KATHLEEN TEARE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:05-CV-1236-RWS |
| RE/MAX OF GEORGIA, INC., | : | |
| | : | |
| Defendant. | : | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Kathleen Teare and four other Plaintiffs filed a Complaint against

Defendant, RE/MAX of Georgia, Inc. ("RE/MAX" or "Defendant"), alleging

multiple claims of sexual harassment, retaliation, intentional infliction of

emotional distress, assault and battery, and negligent hiring/retention.

Defendant moved for summary judgment as to all Plaintiffs' claims, and the

Court granted Defendant's Motion for Summary Judgment as to all Plaintiffs'

claims except Plaintiff Kathleen Teare's claim that RE/MAX retaliated against

her in violation of Title VII.

The parties waived a jury trial, and the case came before the Court for

trial beginning September 8, 2008. After considering the evidence presented at

trial and the arguments of counsel, the Court enters the following Findings of
Fact and Conclusions of Law.

## FINDINGS OF FACT

**THE PARTIES**

1.      Plaintiff Kathleen Teare is a 63-year-old female. She has worked
in the real estate industry since 1978 for various real estate companies in
Atlanta and elsewhere.  Teare began working at RE/MAX in August 2003 as
Senior Vice President of Growth and Co-Regional Director of Georgia,
Tennessee/ Kentucky, and Southern Ohio.  Teare left RE/MAX on September
24, 2004.

2.      Defendant RE/MAX of Georgia, Inc. (RE/MAX) is a Georgia
corporation. It is a franchisor of real estate franchises in Georgia, and parts of
Kentucky, Tennessee, and Ohio.  Its headquarters are located in Alpharetta,
Georgia.

3.      At all times relevant to this litigation, RE/MAX had at least 15
employees.

4.      At all times relevant to this litigation, Howard McPherson
("McPherson") was President and Chief Executive Officer of RE/MAX.

5.      Darko Kapelina began working at RE/MAX on May 3, 2004.  He

2

is currently Chief Operating Officer.  From July 2002 until  May 3, 2004,

Charles Brettell served as the Chief Operating Officer and General Counsel of

RE/MAX.

6.      Scott McPherson, Lisa McPherson, Robin Rail, and Eric

McPherson are McPherson's adult children.  In 2004, they were all on the

Board of Directors of RE/MAX.

7.      The McPherson Family Trust owns RE/MAX, and distributions

are made from RE/MAX to the McPherson Family Trust.  The beneficiaries of

the trust are McPherson's grandchildren.

8.      Lisa McPherson is employed by RE/MAX and is Secretary of the

corporation.

9.      Ken Moe was employed at RE/MAX as its Controller from July

2002 until July 22, 2004, when his employment at RE/MAX was terminated.

**TEARE'S EMPLOYMENT AT RE/MAX**

10.      When she was hired, Teare's responsibilities were to manage

franchise sales and a servicing team and to oversee the marketing and education

departments.  During her employment, Teare was the only woman who was part

of RE/MAX's upper management.

11.     When Teare first began working at RE/MAX, she reported to Brettell.  After Brettell was replaced by Kapelina, Teare reported to Kapelina.

12.     Teare's annual base salary at RE/MAX was $115,000, with an opportunity for a bonus of up to 20% of her base salary. Her base salary was subject to merit and cost-of-living increases at the discretion of management. Teare also received a car allowance of $500 per month; three weeks of vacation per year; and life, health, and dental insurance.  Her cell phone expenses and realtors board dues were reimbursed by the company.

**THE CLAIMS**

13.     Teare has asserted a claim of retaliation against RE/MAX in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). Teare reported to RE/MAX that she and other female employees of RE/MAX had been subject to sexual harassment and discrimination by Moe and Kapelina. She opposed this harassment and discrimination.  As a result of Teare's reporting of and opposition to the conduct of Moe and Kapelina, she contends that she was retaliated against by RE/MAX and that this retaliation ultimately led to her constructive discharge from RE/MAX in September 2004.

AO 72A
(Rev.8/82)

14.     Teare filed a charge of discrimination with the EEOC on January

6, 2005.  The charge alleged, among other things, discrimination based on sex

and retaliation.  She received a right to sue letter dated February 10, 2005.

Teare filed suit on May 10, 2005.  She has fulfilled all of the administrative

prerequisites to filing this suit.

**RE/MAX'S ANTI-DISCRIMINATION POLICY**

15.     The RE/MAX Employee Handbook, effective November 1, 2002,

contains a section entitled "Prohibition Against Discrimination and

Harassment."

16.     The handbook defines harassment as

> verbal or physical conduct that is derogatory or that
> shows hostility towards an individual because of his or
> her race, color, religion, sex, national origin, age,
> disability, or any other factor protected by state or
> federal law, and that creates an intimidating, hostile, or
> offensive working environment. Harassment may
> include, but is not limited to, epithets, abusive
> language, slurs, jokes, or other verbal or physical
> conduct relating to an individual's race, color, religion,
> sex, national origin, age, disability, or any other factor
> protected by state or federal law. Examples of sexual
> harassment include, but are not limited to unwanted
> sexual advances or touching, graphic sexual depictions,
> displays in the workplace or while on RE/MAX of
> Georgia business of sexually suggestive objects or
> pictures, and/or humiliating or offensive comments,

jokes, or innuendos. Sexual harassment may also consist of unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature that creates an offensive or hostile work environment. Sexual harassment does not refer to occasional compliments of a socially acceptable nature. It refers to behavior which is not welcome, which is personally offensive, and which, therefore, interferes with an employee's ability to perform his or her job.

17.     This anti-discrimination policy provided a procedure for complaints:

After a complaint of discrimination or harassment is received, a prompt and impartial investigation will be conducted and appropriate disciplinary action will be taken in the event the complaint is found to have merit. All complaints of discrimination or harassment will be handled in a discreet manner and information will be limited to those personnel with a need to know. Anyone in management who receives complaints or who observes discriminatory or harassing conduct should inform the General Counsel or the Regional Director . RE/MAX of Georgia emphasizes that an employee is not required to complain first to his or her immediate supervisor or Regional Director. If it is determined that discrimination or harassment has occurred, RE/MAX of Georgia will take prompt and appropriate corrective action. RE/MAX of Georgia also emphasizes that it will not tolerate retaliation against any employee for cooperating in an investigation or for making a complaint of discrimination or harassment.

6

## MOE'S CONDUCT

18.     One of Moe's primary responsibilities as Controller was to put RE/MAX's financial records in order.  Within his first six to seven months on the job, Moe instituted accounting controls that resulted in substantial savings to the company and were aimed at preventing future problems.

19.     Several female RE/MAX employees complained about Moe's conduct toward them.

20.     On several occasions, Teare witnessed Moe engaging in inappropriate conduct directed toward women.  She observed Moe looking down the shirts of women who sat at the front desk in the RE/MAX office.  She also observed that he made some of the women in the office very uncomfortable.

21.     Teare saw Moe looking down Marla McCaskill's blouse several times, staring at Robin Sheer's breasts, and looking down the shirt of Kate Shavin who, at that point, was employed at RE/MAX as a receptionist.

22.     Teare also began receiving reports from women in the office concerning Moe's conduct.

23.     McCaskill reported to Teare that Moe stared at her blouse all the time, stared down her chest, was getting too close to her, and made her feel very

7

uncomfortable. McCaskill also stated that Moe had pushed up against her.

24.     Farah Elliott was a female employee at RE/MAX from October 2001 to August 2004. She worked directly for Moe. Elliott complained to Teare that she was uncomfortable with Moe and that she did not feel that she was treated properly.

25.     Heather Rufus also had several conversations with Teare about Moe's conduct. Rufus reported that she had seen Moe look down the receptionist's shirt. She also told Teare about Moe yelling and screaming at her, brushing up against her in the hallways, touching her hair, and having an erection during a meeting that Rufus had attended.

26.     Teare informed Brettell about the complaints of women in the office and of her own observations, beginning in approximately December 2003, and expressed her concerns on subsequent occasions.

**KAPELINA IS HIRED**

27.     RE/MAX terminated Brettell on May 3, 2004.

28.     Defendant hired Darko Kapelina as Executive Vice-President and Manager of Operations, and he began his employment on May 3, 2004. Kapelina had been employed by RE/MAX International, the franchisor from

AO 72A
(Rev.8/82)

which Defendant purchased the rights to sell RE/MAX franchises in the Georgia, Tennessee, Kentucky, and Southern Ohio regions. Kapelina had been extremely successful in growing the number of franchises and agents in regions that were operated by RE/MAX International.

29.     After Kapelina started working at RE/MAX, he conducted introductory interviews with employees in the office. Kapelina asked several female employees whether they were married and if they had children.

30.     Several women complained to Teare about the questions that Kapelina had asked during the interviews, feeling that the questions had been inappropriate. Other women complained to Teare that Kapelina was talking down to them.

31.     Almost immediately after he began working for Defendant, Kapelina determined that Defendant's organizational structure was inefficient and needed to be revised. The structure was not clearly defined, with multiple employees having overlapping responsibilities and supervision of overlapping regions/areas. Additionally, the organization was highly "layered" for an organization of its size, with multiple reporting relationships.

32.     In May 2004, Kapelina took steps to reorganize the structure of the office by streamlining the layered reporting structures. He changed the

AO 72A
(Rev.8/82)

reporting relationships, job responsibilities, and performance expectations of

multiple RE/MAX employees, including Teare.

33.     As part of this effort, in May 2004, Kapelina changed the reporting

structure such that the individual in charge of Franchise Sales, Peter Ortiz,

reported to him rather than to Teare.  In May 2004, Kapelina also gave Teare

additional responsibilities over certain legal and compliance issues.

34.     During the months of May and June 2004, Kapelina reorganized

responsibility for the three RE/MAX regions.  Kapelina assigned the

Kentucky/Tennessee region to Bob Sutton, the Georgia region to Don Dowd,

and the Southern Ohio region to Teare.  Kapelina and McPherson believed that

the Southern Ohio region held the most potential for growth and franchise

expansion.

35.     As a result of this reorganization, the personnel in the Alpharetta,

Georgia office began reporting to Dowd, who was responsible for the region,

rather than Teare, who would be spending at least half her time in Southern

Ohio.

36.     Teare expressed discontent with the changes.  However, she

admitted that, of all Defendant's employees, she was the most qualified to be

responsible for the Southern Ohio region because she had lived in Ohio, she had

developed relationships with the franchise brokers in the area, and she had extensive knowledge of the real estate market in Southern Ohio.

**INVESTIGATION AND TERMINATION OF KEN MOE**

37. On Thursday, July 1, 2004, Farah Elliott called Teare and stated that she and other female employees were going to file suit against RE/MAX because of Moe's and Kapelina's conduct. At the time, Teare was in the process of moving from Atlanta to her new home in Columbus, Georgia.

38. On Tuesday, July 6, 2004, Teare called Howard McPherson, Defendant's Chief Executive Officer, at his home in Florida and informed him that several female employees in Defendant's Alpharetta office were planning to sue the Company because of Moe. Teare stated that most of the employees planned to walk out, and the office may have to close.

39. Teare had been scheduled to go to Ohio for work the afternoon of July 6. McPherson instructed her not to go. He stated that he was going to consult with a human resources attorney and asked that Teare not do anything until he called her back.

40. McPherson called Teare back and informed her that he and Lisa McPherson were going to conduct interviews of all the RE/MAX employees. He instructed Teare to go to the office and stated that he would send out a

memo to tell people that he and Lisa McPherson would be in the office the
following week.

41.     McPherson instructed Moe not to return to the office until the
investigation was complete and placed Moe on paid administrative leave.

42.     Kapelina was on vacation at the time, but McPherson called him
and advised him about Teare's call.  McPherson told Kapelina that McPherson
would be investigating the claims and conducting interviews.  McPherson also
instructed Kapelina not to return to the office while the investigation was
underway.

43.     On July 7, McPherson sent an e-mail to eighteen  RE/MAX
employees announcing that a report of conduct possibly violating the company's
policy concerning discrimination and harassment had been received.  The email
stated that McPherson wanted to interview the employees on July 12
and 13.  The email also stated that the company would not tolerate retaliation
against employees participating in the investigation.  Employees were told to
notify McPherson immediately if they believed there was retaliation.

44.     The investigation was conducted by McPherson and his daughter
Lisa McPherson.

45.    Neither McPherson nor Lisa McPherson had any legal training or any training in conducting investigations into allegations of sexual harassment or sexual discrimination.  Neither of them had ever conducted a workplace investigation prior to investigating the allegations against Moe and Kapelina.

46.    On Monday, July 12 and Tuesday, July 13, 2004, Howard McPherson and Lisa McPherson visited the Alpharetta office and interviewed both the male and female employees that were in the office that week.  The McPhersons previously had interviewed Elliot on July 9, 2004, by telephone because she was to be on vacation the week of July 12, 2004.

47.    Lisa McPherson interviewed Teare on July 13, 2004.  Howard McPherson was present for the initial part of the interview, but left before its conclusion because he had spoken with Teare about her concerns on July 6. During this interview, Teare voiced complaints about Kapelina's management; i.e., that he had not reacted to her satisfaction after someone anonymously posted derogatory comments about her on an external website and that she was not pleased with the organizational changes he was making within RE/MAX. Teare also stated that some of the complaints by the other women may be efforts to obtain financial gain.

AO 72A
(Rev.8/82)

48.     McPherson and Kapelina met with Moe on July 13, 2004.  The meeting with Moe lasted about 10 to 15 minutes.  McPherson told Moe what the allegations against him were, and Moe denied all of the allegations except that he had flipped Rufus's hair.

49.     Kapelina provided Moe with a memorandum dated July 22, 2004, indicating that RE/MAX was terminating his employment.  The memorandum stated: "We find that you have behaved unacceptably by talking to coworkers in an angry, belittling, confrontational, and loud manner.  Additionally, we find that you have occasionally crowded and/or invaded the personal space of coworkers, which conduct may have resulted in unwelcome physical contact."  The "we" referred to McPherson and Kapelina.  RE/MAX concluded that Moe's conduct was not sexual in nature.  The memorandum stated that Moe's employment was being terminated immediately.

50.     RE/MAX entered into a separation agreement with Moe on August 5, 2004.  The agreement provided that RE/MAX would pay Moe his current salary for a period of two months.  RE/MAX further agreed that it would not challenge any application that Moe might make for unemployment benefits, if legally possible.

AO 72A
(Rev.8/82)

51.     After his termination, Moe met with RE/MAX employees on occasion, after hours, to transition management of the company's finances.

**EVENTS FOLLOWING COMPLAINTS AGAINST MOE**

52.     Despite the fact that Kapelina had been the subject of some of the discrimination complaints expressed to Teare (which Teare then reported to McPherson), Kapelina repeatedly asked Teare why she had not reported the allegations to him.

53.     The week after the interviews, Kapelina called Teare into his office to discuss the interviews.  Kapelina asked Teare why she had called McPherson instead of him. During the discussion, Kapelina slammed his cell phone on the desk and repeatedly asked why Teare had not called him.  Teare responded that she felt he was part of the problem that had been raised by the employees and that she should report the issue to McPherson.  Kapelina told her that she was to call him if there was ever another issue.  He told Teare that she was never again to call McPherson.

54.     At the end of June 2004, Kapelina had informed Teare that she would need to spend 50% of her time in the Southern Ohio region and 50% of her time would be related to other regional responsibilities.

AO 72A
(Rev.8/82)

55.     After being given increased responsibilities for the Southern Ohio

region, on June 28, 2004, Teare proposed, and Kapelina accepted, goals for

earning a bonus for the second half of 2004.  The goals were that she obtain

nine (9) new franchise sales and a net gain of fifty (50) agents in the Southern

Ohio region by December 31, 2004.  If she met these goals, she would receive

100% of her bonus.  If she did not meet the goals, she would receive a

percentage of her bonus equal to the percentage of the goal she met.

56.     Teare's remaining regional responsibilities were taken

away, with the exception of completing reviews for two employees and revising

the Uniform Franchise Offering Circulars for each region.

57.     On July 20, 2004, Kapelina announced at a staff meeting that all

staff in the Alpharetta office would from then on report to him instead of Teare.

58.     Teare expressed concerns to Kapelina about Chris Kidd.

Specifically she suspected that Kidd had posted a profane message about her on

the internet.  She said she felt uncomfortable meeting with him.  She also stated

that his performance was lacking.

59.     At Kapelina's request, Teare compiled a list of her performance

concerns.  On July 26, 2004, Kapelina terminated Kidd for poor performance.

AO 72A
(Rev.8/82)

60.     On August 2, 2004, Teare submitted an action plan to Kapelina concerning her plans to increase growth in the Southern Ohio region.  On August 5, 2004, Kapelina responded by praising Teare's plan to focus on franchise sales and signed off on her plan for meeting the targets that had been set for Southern Ohio in June.

61.     As of August 7, 2004, there were no new franchises and a net gain of three (3) agents since July 1 in Southern Ohio.

62.     On August 7, 2004, Kapelina reported at a Board of Directors meeting that Teare had been placed on a 90-day performance improvement plan.  However, Teare was not informed about the plan until the following day.

63.     On August 8, 2004, Kapelina and McPherson met with Teare while they were in Quebec for a conference.  Kapelina informed Teare that she was being placed on a performance improvement plan.  The performance plan set goals of five (5) new franchise sales and a net gain of twenty-five (25) agents by November 8, 2004.  These goals were based, at least in part, on the goals that Teare had previously set for herself, and were equal to approximately one-half of the goals Teare had set for herself on June 28, 2004.

64.     The plan also addressed other performance issues for Teare.  Specifically, Kapelina instructed Teare not to sign any contract or agreements

17

that could bind the Company without Kapelina's prior approval. In June 2004, Teare had signed a confidentiality agreement binding the Company without prior approval, despite repeated instruction from Kapelina not to sign contracts on behalf of the Company. Teare was also instructed to refrain from disclosing confidential information, which was a direct result of Teare's disclosure of a franchisee's confidential business information to a third-party consultant and to individual agents.

65.    Kapelina ordered Teare to focus 100% of her time on the Southern Ohio region and not to come into the Alpharetta office without his permission. She was to move all of her things out of the office in a way that would not arouse suspicion from the other employees.

66.    During the August 8 meeting, Kapelina informed Teare that she had been subversive in the office and was undermining his goals and objectives.

67.    Teare requested that she be given the performance improvement plan in writing.

68.    On August 13, Teare sent Kapelina and McPherson a memorandum recounting what she had been told during the August 8 meeting about her performance and rebutting each criticism.

AO 72A
(Rev.8/82)

69.    On August 24, Kapelina provided Teare with a written performance plan.  Teare refused to sign the plan.

70.    The performance plan stated that violation of the plan constituted grounds for termination.  However, Teare was told that if she could meet the growth goals within the ninety-day period, the Company would work with her to determine the next step of improving the region's performance.

71.    After receiving the written performance plan and before Labor Day 2004, Kapelina was informed by Clyde Good that Teare stated to him that the Southern Ohio regional office was going to be closed or sold.  Kapelina called McPherson and informed him of this information.  Teare learned of Kapelina's call and, despite Kapelina's threats to Teare that if she called McPherson she would be fired, Teare called McPherson to deny Kapelina's account. McPherson assured Teare she would not be fired and that she could call him any time.

72.    In early September 2004, Teare attended a meeting of the Georgia Association of Realtors in Destin, Florida.  Dowd also attended the meeting and informed other attendees that he was now in charge of the Georgia region for RE/MAX.

73.    When Teare returned from the meeting, she tendered her resignation via email to McPherson and Kapelina effective September 24, 2004.

AO 72A
(Rev.8/82)

74.     When McPherson received Teare's email, he called Teare and tried to convince her not to resign.  She stated to him that she was resigning.

75.     Plaintiff testified that the events at RE/MAX had been a devastating experience because she had never had a similar experience in her life.  She said that the events caused marital problems between her and her husband and affected her sleep and her health.

## CONCLUSIONS OF LAW

### *PRIMA FACIE* CASE OF RETALIATION

76.     "Proof of retaliation is governed by the framework announced in McDonnell Douglas Corp, v . Green."  Donnellon v. Fruehauf Corp ., 794 F.2d 598, 600 (11th Cir. 1986).  First, a plaintiff must present *prima facie* proof of retaliation.  Id. at 600.  Once a plaintiff has established a *prima facie* case, the defendant must put forward a legitimate, non-discriminatory reason for the adverse employment action.  The plaintiff must then demonstrate that the proffered explanation is a pretext for retaliation.  Id. at 600-01.  See also Meeks v. Computer Associates Int'l., 15 F.3d 1013,1021 (11th Cir . 1994); Tipton v. Canadian Imperial Bank of Commerce, 872 F .2d 1491, 1494-95 (11th Cir 1989).

AO 72A
(Rev.8/82)

77.     To establish a *prima facie* case of retaliation, a plaintiff must (1) show that she engaged in protected activity; (2) show that she suffered a materially adverse action; and (3) establish a causal link between the protected activity and the materially adverse action. Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir . 2008).  See also Stavropolous v. Firestone, 361 F .3d 610, 616 (11th Cir. 2004); Lipphardt v. Durango Steakhouse of Brandon, 267 F.3d 1183, 1186-87 (11th Cir . 2001); Tipton, 872 F.2d at 1494.

78.     Section 704 of Title VII of the Civil Rights Act of 1964 prohibits discrimination by an employer against an employee for opposing an unlawful employment practice.  42 U.S.C. § 2000e-3(a); Lipphardt, 267 F.3d at 1186-87 (11th Cir. 2001).  A plaintiff need not prove that the underlying conduct she opposed is, in fact, a violation of Title VII.  Instead, the plaintiff must show a reasonable, good faith belief that the discrimination existed.  Meeks, l5 F.3d at 1021; Tipton, 872 F.2d at 1494 ("Title VII prohibits an employer from discriminating against an employee who has opposed what she believes to be unlawful discrimination.") (citing 42 U .S.C. § 2000e-3(a)). The objective reasonableness of a plaintiff's belief is measured against existing substantive law.  Clover v. Total System Svcs., Inc., 176 F .3d 1346, 1351 (11th Cir. 1999).

AO 72A
(Rev.8/82)

79.     Teare opposed Moe's conduct toward the women in the RE/MAX office and complained about Kapelina's (1) reassignment of her job responsibilities to men whom she felt were less qualified than she and (2) discriminatory treatment of other women in the office.  Teare's July 6, 2004 phone call to McPherson constituted protected activity, as did her July 13, 2004 interview with Lisa McPherson.  Teare's complaints fell within the opposition clause of Title VII.

80.     Protection under Section 704(a) of Title VII, "is not limited to individuals who have filed formal complaints, but extends as well to those . . . who informally voice complaints to their superiors or who use their employers' internal grievance procedures."  Rollins v. State of Florida Dept of Law, 868 F.2d 397, 400 (11th Cir. 1989).  See also Meeks, 15 F.3d at 1015, 1021 (upholding trial court's determination that plaintiff's internal complaint of unequal pay was protected conduct); Holifield v . Reno, 115 F.3d 1555, 1566 (11th Cir. 1997) (citing Rollins).

81.     During the July 6 phone call, Teare informed McPherson that several of the women in the office were planning on filing a lawsuit against RE/MAX because of Moe's and Kapelina's conduct toward them.  Based on her own observations, Moe's and Kapelina's conduct toward her, and the complaints

she had received from women in the office about Moe's and Kapelina's conduct over the preceding months, Teare had a good faith belief that this behavior was an unlawful employment practice. Further, it was objectively reasonable for Teare to believe that Moe's and Kapelina's conduct was in violation of the law. See Hudson v . Norfolk So. Ry. Co., 209 F. Supp . 2d 1301, 1314 n.16 (N.D. Ga. 2001) (noting that court may consider conduct plaintiff learned about through others, but did not witness herself, in determining whether plaintiff had objectively reasonable belief that discrimination had occurred) .

82.     The "adverse employment action" standard previously used in this Circuit is more stringent than the "materially adverse" standard set forth by the Supreme Court in Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). Crawford, 529 F.3d at 973-94. The test is whether the action would have been materially adverse to a reasonable employee . This means actions that might have dissuaded a reasonable worker from making or supporting a charge of discrimination. Id. at 974. The adverse action is not restricted to acts that occur in the workplace and need not be related to employment. Id. at 973. See also DeLong v . Best Buy Co., 211 Fed. App'x. 856, 857 n. 2 (11th Cir. 2006).

83.     The realignment of the organizational structure of RE/MAX in May 2004 was not a retaliatory act. The Company had legitimate,

AO 72A
(Rev.8/82)

nondiscriminatory, business reasons for the decision to restructure. Southern

Ohio was an underperforming region, and Teare was the most qualified person

to oversee that region.

84.    However, after Teare's interview on July 13, 2004, Kapelina

immediately began to remove Teare's job responsibilities. Kapelina criticized

her for not having reported the sexual harassment and discriminatory conduct

directly to him. Kapelina then placed Teare on a 90-day performance

improvement plan and banned her from the Alpharetta offices of RE/MAX.

85.    On July 20, Kapelina informed Teare that she was now to spend

100% of her time working in the Southern Ohio region. After finishing a few

remaining regional responsibilities, Teare would no longer have any regional

responsibilities at RE/MAX's headquarters. Kapelina removed Teare's

responsibility for legal/compliance and told the office staff that they would now

report to him and not to Teare. Less than two months earlier, he had told Teare

to spend 50% of her time concentrating on Southern Ohio and 50% of her time

on her regional responsibilities at headquarters. See Berman v. Orkin

Exterminating Co., 160 F.3d 697, 702 (11th Cir. 1998) (noting that involuntary

transfer, coupled with sharp corresponding reduction in territory size, can

constitute adverse employment action). See also Tadlock v . Powell, 291 F.3d

541, 547 (8th Cir. 2002) (reassignment to less prestigious position that did not involve supervising employees constitutes adverse employment action) .

86.     On August 7, 2004, Kapelina reported to the Board of Directors that Teare had been placed on a 90-day performance improvement.   He further reported to the Board that Teare had been subversive.  However, Teare was not placed on the performance plan until the following day during her meeting with McPherson and Kapelina.

87.     During that August 8, 2004 meeting, Kapelina further ordered Teare not to come into the Alpharetta office without his permission.  She was to move all of her things out of the office in a way that would not arouse suspicion from the other employees.  Kapelina informed Teare that she had been in the office and was trying to undermine his goals and objectives. McPherson either approved of or acquiesced in Kapelina's conduct toward Teare.

88.     Kapelina provided Teare with a written version of the performance plan on August 24.  The plan was to be in effect until November 8, 2004. Violation of the performance plan could result in Teare's termination.

89.     All of the foregoing constituted materially adverse actions against Teare.  These actions clearly would have dissuaded a reasonable employee from reporting discrimination and sexual harassment as Teare had.  Bass v. Bd. of

AO 72A
(Rev.8/82)

<u>Cty. Comm'rs, Orange Cty, Fla.</u>, 256 F.3d 1095, 1118-19 (11th Cir. 2001)

(considering actions collectively in finding that conduct met higher adverse

employment action standard in Title VII case).

90.     The causal link necessary to establish a claim of retaliation

> [is not] the sort of logical connection that would
> justify a prescription that the protected participation in
> fact prompted the adverse action.  Such a connection
> would rise to the level of direct evidence of
> discrimination, shifting the burden of persuasion to
> the defendant.  Rather, we construe the 'causal link'
> element to require merely that the plaintiff establish
> that the protected activity and the adverse action were
> not wholly unrelated.

<u>Weaver v. Casa Callardo, Inc.</u>, 922 F.2d 151,1525 (11th Cir .1991) (quoting

<u>Simmons v. Camden Co. Bd. of Educ .</u>, 757 F .2d 1187,1189 (11th Cir. 1985))

(alternation in original).  <u>See</u> <u>also</u> <u>Clover</u>, 176 F.3d at 1354. The requirement of

a causal link is interpreted broadly, <u>Meeks</u>, 15 F.3d at 1021, and can be

established through circumstantial evidence, <u>Bass</u>, 256 F.3d at 1103.

91.     Teare opposed the sexual harassment and discrimination that

women in the RE/MAX office reported to her.  She further opposed the

discrimination she believed she had suffered at the hands of Kapelina.  Within

days after Teare's July 13, 2004 interview, Kapelina proceeded to transfer her to

Southern Ohio on a full-time basis and to threaten to fire her if she called

McPherson again. On August 8, 2004, Kapelina and McPherson banned Teare

from the Alpharetta office and placed her on a performance plan that required

compliance or possible termination. Berman, 160 F.3d at 702 (finding evidence

that first involuntary transfer took place within five weeks after plaintiff filed

EEOC charge and first and second involuntary transfers took place "within a

couple of months" after the complaint sufficient to establish *prima facie* case of

retaliation).

92.     The retaliatory conduct against Teare followed almost immediately

after her call to McPherson and the investigative interview. In addition to this

temporal proximity, Kapelina's comments that Teare was being "subversive,"

banning her from the office, and threats related to Teare's having informed

McPherson (but not him) about the complaints of sexual harassment and

discrimination provide a further link between Teare's protected activity and the

materially adverse actions taken against her. Weaver, 922 F.2d at 1525

(negative reviews and careful scrutiny of plaintiff's performance, coupled with

testimony of management's knowledge of plaintiff's EEOC charge, sufficient to

establish causal link for prima facie case of retaliatory discharge).

93.     Based on the foregoing, the Court concludes that Plaintiff has

established a *prima facie* case of retaliation.

94.     RE/MAX asserts that there were legitimate nondiscriminatory reasons for all of the foregoing actions.  Specifically, Kapelina testified that these actions were motivated by a desire to develop Southern Ohio and to assure that Plaintiff focused all of her attention on Southern Ohio.

95.     The Court concludes that Defendant's proffered reason of assuring that Teare's full attention would be focused on Southern Ohio is pretextual.  The court concludes that these actions were taken against Teare for retaliation.

96.     The decision to place Teare on a performance plan just over a month after restructuring took place was retaliatory.  Defendant points to the lack of progress that had been made during that month but fails to acknowledge the turmoil occurring within the Company at that time.  Just as Teare was about to leave for Ohio, the allegations by female employees arose and Teare was instructed by McPherson to remain in Georgia.  The Company then conducted its investigation which was not "concluded" until July 22.

97.     Just over two weeks later, Teare was put on a performance plan that introduced termination from employment as a possible consequence for not achieving 100% of what had theretofore been a bonus goal.

98.     Peter Ortiz, the head of franchise sales for the entire Company was directed to focus all his efforts in Southern Ohio.  There was no evidence that

AO 72A
(Rev.8/82)

he sold any franchises between July 1 and August 7. Yet, there was no evidence of any action taken against him.

99. The performance plan also isolated Teare from the Alpharetta office. Unlike any other employee in the Company, she could not enter the home office without Kapelina's permission.

**CONSTRUCTIVE DISCHARGE**

100. Although, Teare established that she was subjected to unlawful retaliation, she did not establish that her voluntary resignation was a constructive discharge. To establish a constructive discharge, the plaintiff must prove that the employer intentionally and deliberately rendered the working conditions so intolerable that the employee was compelled to quit involuntarily. Buckley v. Hospital Corp. of America, Inc., 758 F.2d 1525 (11th Cir. 1985). To find constructive discharge, the trier of fact must be satisfied that working conditions were so difficult or unpleasant that a "reasonable person in the employee's shoes would have felt compelled to resign." Garner v. Wal-Mart Stores, Inc., 807 F. 2d 1536, 1539 (11th Cir. 1987) (citing Bourque v. Powell Elec. Manuf. Co., 617 F.2d 61, 65 (5th Cir. 1980)). "[P]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast." Flanagan, v. McKesson Corp., 708 F. Supp.

AO 72A
(Rev.8/82)

1287, 1280 (N.D. Ga. 1988) (emphasis in original). Moreover, the "threshold for establishing constructive discharge. . .is quite high, higher than that for proving a hostile work environment." <u>McDaniel v. Merlin Corp.</u>, 2003 U.S. Dist. LEXIS 16472, at *44 (N.D. Ga. June 6, 2003) (citing <u>Hipp Liberty Nat'l Life Ins. Co.</u>, 252 F.3d 1208, 1231 (11th Cir. 2001), cert. denied, 534 U.S. 1127 (2002)).

101.   Plaintiff did not present evidence at trial that showed that her working conditions were intolerable.

102.   Although, under the terms of the written plan, failure to meet the goals of her performance plan could have resulted in termination, termination was not a certainty. In fact, she was told that if she did not meet the goals, the matter would be discussed further. The goals were not unreasonable. They were consistent with goals Teare had set for herself. Further, the evidence was uncontradicted that Teare had been assigned to the region with the greatest potential for growth. Also, McPherson informed Teare on at least two occasions that her job was secure, and she would not be terminated. Despite these assurances, she voluntarily resigned on September 11, 2004, giving the Company a two-week notice until September 24, 2004. Even after she submitted her resignation, McPherson urged her to stay.

AO 72A
(Rev.8/82)

103. The timing of Teare's resignation, immediately following the meeting in Destin, suggests that he decision to resign was motivated more by the reorganization of RE/MAX than by any retaliatory acts.

## DAMAGES

**BACK PAY**

104. Back pay is awarded to make persons whole for injuries suffered through past discrimination. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 (1975). Where a person has not lost any wages or benefits as a result of the alleged discriminatory action, back pay is not necessary to make the person whole. Boyette v. American Int'l Adjustment Co., 1994 U.S. Dist. LEXIS 4594, at *28 (N.D. Ga. Mar. 31, 1994). Here, Teare was not constructively discharged; she voluntarily resigned. As such, an award of back pay is inappropriate because the retaliation did not cause Plaintiff to suffer lost wages. Hertzberg v. SRAM Corp., 261 F.3d 651, 659 (7th Cir. 2001) cert. denied 534 U.S. 1130 (2002); Mallinson-Montague v. Pocrnick, 224 F.3d 1224, 1236-37 (10th Cir. 2000) (affirming judgment for the Title VII sexual harassment plaintiffs and the denial of back pay because the plaintiffs had resigned, and the jury had rejected their constructive discharge claim); see also Derr v. Gulf Oil

AO 72A
(Rev.8/82)

Corp., 796 F.2d 340, 342 (10th Cir. 1986) ("The remedies of back pay and reinstatement are not available to [plaintiff] unless she was constructively discharged.").

**FRONT PAY**

105.    Courts award front pay to compensate the plaintiff for lost future wages and benefits.  Front pay, however, remains a special remedy, warranted only by egregious circumstances.  Eskra v. Provident Life & Accident Ins. Co., 125 F.3d 1406, 1417 (11th Cir. 1997); Richardson v. Tricome Pics. & Prods., 334 F. Supp. 2d 1303, 1319 (S.D. Fla. 2004).  Because of the "potential for windfall, [the] use [of front pay] must be tempered."  Lewis v. Fed. Prison Indus., Inc., 953 F.2d 1277 (11th Cir. 1992) (citing Duke v. Uniroyal, Inc., 928 F.2d 1413, 1424 (4th Cir. 1991)).  Here, because Plaintiff cannot establish that she was constructively discharged, she is not entitled to front pay.  An alleged victim of discrimination that loses her employment as a result of discrimination must show either an actual or constructive discharge in order to receive the equitable remedy of reinstatement, front pay in lieu of reinstatement, or back pay.  Hertzberg v. SRAM Corp., 261 F.3d 651, 659 (7th Cir. 2001) cert. denied 534 U.S. 1130 (2002); Mallinson-Montague v. Pocrnick, 224 F.3d 1224, 1236-37 (10th Cir. 2000) (affirming judgment for the Title VII sexual harassment

AO 72A
(Rev.8/82)

plaintiffs and the denial of back pay because the plaintiffs had resigned, and the jury had rejected their constructive discharge claims); see also Derr v. Gulf Oil Corp., 796 F.2d 340, 342 (10th Cir. 1986) ("The remedies of back pay and reinstatement are not available to [plaintiff] unless she was constructively discharged.").

**COMPENSATORY DAMAGES**

106.   "As a general rule, general compensatory damages, as opposed to special damages, need not be proven with a high degree of specificity." Akouri v. State of Florida Dept. of Transp., 408 F.3d 1338, 1345 (11th Cir. 2005). Compensatory damages "may be inferred from the circumstances as well as proved by the testimony." Gore v. Turner, 563 F.2d 159, 164 (5th Cir. 1977). "A plaintiff may be compensated for intangible, psychological injuries as well as financial, property, or physical harms." Ferrill v. Parker Group, Inc., 168 F.3d 468, 476 (11th Cir. 1999).

107.   RE/MAX asserts that Plaintiff's conclusory statements about emotional distress are insufficient to support an award of compensatory damages.  RE/MAX cites the holding in Tucker v. Housing Auth. of Birmingham Dist., 229 Fed. Appx. 820, 827 (11th Cir. 2007) requiring a plaintiff to establish "demonstrable emotional distress."  In Tucker, the plaintiff

"testified that his relationship with his family suffered because of depression and anxiety. He also told the jury of physical effects, such as digestive problems and an inability to sleep." <u>Id.</u> The court held that this evidence was sufficient to support an award of damages for mental anguish.

108. In the present case, Plaintiff did not offer many specifics about the harms she suffered. However, she testified that, as a result of the events complained of, she suffered marital difficulties as well as sleep and health problems. The Court concludes that the lack of evidence of pecuniary loss or physical symptoms goes "more to the amount, rather than the fact, of damages." <u>Marable v. Walker</u>, 704 F.2d 1219, 1220 (11th Cir. 1983). <u>See</u> <u>also</u> <u>Bogle v. McClure</u>, 332 F.3d 1347, 1359 (11th Cir. 2003) (compensatory damages upheld for plaintiffs who testified that employer's actions "upset," "embarrassed," and "humiliated" them and made them "ashamed").

109. The Court concludes that Plaintiff is entitled to an award of compensatory damages. Based upon the limited evidence offered by Plaintiff as to the harms she suffered, the Court awards Plaintiff the sum of $10,000.00 for emotional distress.

AO 72A
(Rev.8/82)

## PUNITIVE DAMAGES

110.   "To recover punitive damages under Title VII, a plaintiff must prove that defendant has engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.  Malice or reckless indifference is shown when the employer knowingly violates federal law, which requires a showing of either an evil motive or intent to deprive a plaintiff of his or her federally protected rights or a conscious indifference to those rights.  At a minimum, in order to be liable in punitive damages, an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law."  Richardson v. Tricom Pictures & Productions, Inc., 334 F.Supp. 2d 1303, 1319-20 (S.D. Fla. 2004) (internal citations and quotations omitted).

111.   Plaintiff failed to establish malice or reckless indifference on the part of RE/MAX.  Accordingly, Plaintiff is not entitled to punitive damages.

## ATTORNEY'S FEES

112.   As the prevailing party, Plaintiff is entitled to an award of reasonable attorney's fees.  42 U.S.C. §200e-5(k).  By agreement of the parties, the issue of the amount of attorney's fees was reserved until after trial.  Plaintiff

shall submit a statement of fees within ten (10) days of the entry of this order.
RE/MAX shall have five (5) days thereafter to file objections to the request.

**CONCLUSION**

Based on the foregoing, the Court finds in favor of Plaintiff and awards her $10,000.00 as compensatory damages. The Court also finds that Plaintiff is entitled to an award of attorney's fees and costs of this action. Plaintiff shall submit a statement of fees within ten (10) days of the entry of this Order, and Defendant shall have five (5) days thereafter to file objections to the request.

**SO ORDERED**, this _30th_ day of September, 2008.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

36